JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

16 5145

## I. (a) PLAINTIFFS
Carol Vorchheimer

**DEFENDANTS**
The Philadelphian Owners' Association, June Idzal, and Frank J. Bonom

**(b)** County of Residence of First Listed Plaintiff **Philadelphia**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Philadelphia**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stuart D. Lurie, Rosenthal Lurie LLC, 486 Thomas Jones Way, Suite 210, Exton, PA 19341 (484)693-0788

Attorneys *(If Known)*
Robert Krandel, Freeman Mathis & Gary LLP
1800 JFK Blvd., Suite 1500, Phila., PA 19103
267.758.6022

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1 U.S. Government Plaintiff
- ❏ 2 U.S. Government Defendant
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | **PERSONAL INJURY** ❏ 365 Personal Injury - Product Liability ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 840 Trademark | ❏ 460 Deportation |
| | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 891 Agricultural Acts |
| | | | ❏ 791 Employee Retirement Income Security Act | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 950 Constitutionality of State Statutes |
| ❏ 240 Torts to Land | ☒ 443 Housing/ Accommodations | ❏ 530 General | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application ❏ 465 Other Immigration Actions | |
| | ❏ 448 Education | ❏ 550 Civil Rights ❏ 555 Prison Condition ❏ 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
FHAA, 42 U.S.C. 3601 et seq.
Brief description of cause:
Disability discrimination in housing

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ assorted

CHECK YES only if demanded in complaint:
JURY DEMAND: ❏ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

SEP 28 2016

DATE 9/28/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Carol Vorchheimer | : | CIVIL ACTION |
| v. | : | |
| The Philadelphian Owners' Association, et al. | : | NO. **16**   5 1 4 5 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                                        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                                                 ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                                                    (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.            ( )

| 9/28/16 | Stuart D. Lurie | Plaintiff, Carol Vorchheimer |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 484.693.0788 | 215.600.1728 | Stuart@RosenthalLurie.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

SEP 28 2016

**UNITED STATES DISTRICT COURT**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 2401 Pennsylvania Ave., Apt. 12B-32, Philadelphia, PA 19130

Address of Defendant: 2401 Pennsylvania Ave., Philadelphia, PA 19130

Place of Accident, Incident or Transaction: 2401 Pennsylvania Ave., Philadelphia, PA 19130
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐ No☒

Does this case involve multidistrict litigation possibilities?    Yes☐ No☒
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐ No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐ No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, Stuart D. Lurie , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☒ Relief other than monetary damages is sought.

DATE: 9/28/16                                         83391
            Attorney-at-Law                        Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 9/28/16                                         83391        SEP 28 2016
            Attorney-at-Law                        Attorney I.D.#

CIV. 609 (5/2012)

$4400

**JS**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

CAROL VORCHHEIMER

      Plaintiff,

    v.

THE PHILADELPHIAN OWNERS'
ASSOCIATION, JUNE IDZAL, and FRANK J.
BONOM,

      Defendants.

Civ. A. No.

**16    5145**

## VERIFIED COMPLAINT

Plaintiff, Carol Vorchheimer, by her attorneys, Rosenthal Lurie LLC, hereby files this Complaint against Defendants, The Philadelphia Owners' Association, June Idzal, and Frank J. Bonom, and in support hereof, avers as follows:

### THE PARTIES

1. Plaintiff, Carol Vorchheimer ("Mrs. Vorchheimer"), is an individual residing at 2401 Pennsylvania Ave., Apt. 12B-32, Philadelphia, PA 19130. Mrs. Vorchheimer's residence is a unit within the "Philadelphian" condominium building.

2. Defendant, The Philadelphian Owners' Association ("POA"), is a Pennsylvania non-profit corporation with an address of 2401 Pennsylvania Ave., Philadelphia, PA 19130.

3. Defendant, June Idzal, is an individual resident of the Philadelphian, and is the president of the POA.

4. Defendant, Frank J. Bonom, is an individual employed as the general manager of the Philadelphian.

### JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331 and § 1337 because this action is brought under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

6.      This Court has personal jurisdiction over Defendants because they all reside or work within the Eastern District of Pennsylvania.

7.      Venue is proper in the Eastern District of Pennsylvania because the events giving rise to the claim occurred here.

<div align="center">MRS. VORCHHEIMER'S DISABILITY</div>

8.      Mrs. Vorchheimer and her husband purchased the condominium unit in the fall of 2000.

9.      In October 2014, Mrs. Vorchheimer's husband died, and Mrs. Vorchheimer is now the sole owner and occupant of the condominium unit.

10.     Mrs. Vorchheimer is disabled. Among other things, Mrs. Vorchheimer suffers from pulmonary hypertension, which substantially affects her ability to walk, lift, carry, and stand for periods of time.

11.     These disabilities are permanent, and will last the rest of her life.

12.     Notwithstanding her disabilities, Mrs. Vorchheimer tries to lead as active and as independent a lifestyle as she can. She uses her car multiple times a day to come and go from the Philadelphian, and has a much-coveted designated parking spot (for which she waited years to obtain) located right outside the building.

13.     Due to her disabilities, however, Mrs. Vorchheimer can only walk limited distances with her cane.

14.     Beginning in or around July 2015, Mrs. Vorchheimer required the consistent use of a rolling walker in order to continue to live independently.

<div align="center">2</div>

15.     The walker has a bench / basket area where she can place items because she cannot lift or carry things.

16.     Ms. Vorchheimer uses her rolling walker to get from her condominium unit to the lobby of her building.

17.     She then switches to her cane to get from the condominium building to her designated parking spot outside.

18.     Due to her disabilities, Mrs. Vorchheimer is not physically capable of lifting, folding, or placing her walker in and out of her car.

19.     Mrs. Vorchheimer, therefore, needs to be able to leave her walker in an easily accessible location in the lobby of the building so that it is readily available to and independently retrievable by her when she returns to the building.

### DEFENDANTS REFUSE MRS. VORCHHEIMER'S REQUESTED ACCOMMODATION EVEN THOUGH IT IS REASONABLE ON ITS FACE.

20.     Starting in August 2015, Defendants have exhibited, by their words and conduct toward Mrs. Vorchheimer, a fundamental misunderstanding and misapplication of the law as it pertains to dealing with requests by the disabled for reasonable accommodations in housing.

21.     Defendants have never evaluated the reasonableness of the accommodation Mrs. Vorchheimer actually requested – namely, the ability to leave and independently retrieve her walker from the lobby of the building.  Such an accommodation imposes no financial or administrative burden on the Philadelphian whatsoever, nor does it fundamentally alter the nature of the Philadelphian's operations.

22.     Instead, Defendants – from the very beginning – have sought to force Mrs. Vorchheimer to accept their preferred "alternative" accommodations, all of which take away

3

Mrs. Vorchheimer's independence and render her completely dependent upon the availability of others.

23.     On August 12, 2015, upon instructions of Defendant Bonom, a staff member of the Philadelphian removed Ms. Vorchheimer's walker from a corner of the lobby and placed it in a storage room behind the concierge desk where she could not independently access it.

24.     The following day, Mrs. Vorchheimer complained in writing to Defendant Bonom, advising him that the walker was being left along a wall in the lobby for her safety, and that it was in a safe place where no one would trip over it. (A true and correct copy of Mrs. Vorchheimer's August 13, 2015 e-mail is attached hereto as Exhibit 1.)

25.     Defendant Bonom responded that "we would not want residents to leave their shopping carts or other items in the lobby" because it could become "unsightly." (A true and correct copy of Defendant Bonom's August 13, 2015 e-mail is attached hereto as Exhibit 2.) Later that same day, Mr. Bonom stated in a subsequent e-mail that "No one is disputing your need for a walker" but insisted that storage of the walker should nevertheless be in an "out of sight location[.]" (*Id.*)

26.     Later that month, on August 28, 2015, on the express direction of Defendant Bonom, Mrs. Vorchheimer's walker was again confiscated from the lobby and placed in a storage room inaccessible to her. Mrs. Vorchheimer again complained in writing.

27.     In written response the following day, Defendant Idzal acknowledged Mrs. Vorchheimer's specific requested accommodation, but – without articulation of any supposed financial or administrative burden – nevertheless insisted that Mrs. Vorchheimer should be forced to give up her independence in the interest of lobby aesthetics:

4

I have been at The Philadelphian since 1978 and no past Board or management has ever condoned residents leaving bikes, scooters, packages, carts, walkers, strollers, wheelchairs, crutches etc. in our exterior lobby area. I'm sure that when you really reflect on how having 776 units of residents "leaving their personal belongs" you would see that it would cause many more problems than it would solve. That's why we have the designated storage area behind the Lobby desk!

Your specific issue: you want to leave your walker in a special place designed by you in the lobby area when you return from your errands because you do not wish to wait should another person be ahead of you at the lobby desk due to fatigue issues. Why not just make a phone call to the desk (215-232-1447) or the doorman (215-232-1443) to let them know "I'm going to return at x time, please have my walker available for me." That solves it all. It's safely stored and waiting for you when you want it!

(A true and correct copy of Defendant Idzal's August 29, 2015 e-mail is attached hereto as Exhibit 3.)

28. On or about September 9, 2015, Mrs. Vorchheimer provided Defendants with a letter from her physician, Dr. Susan Day, confirming her disability and need for assistive devices to walk while maintaining independence:

…The walker allows her to distribute her weight more evenly and move with less effort. In addition, it allows her to exert less strain on her wrist which has carpal tunnel syndrome, reducing pain, and significantly improves her mobility.

Now living alone, Ms. Vorchheimer requires optimization of her physical status and use of assistive devices to maintain her independence. She is a strong and capable woman who can take advantage of appropriately provided assistance to maximize her functional status.

(A true and correct copy of Dr. Day's letter is attached hereto as Exhibit 4.)

29. On September 10, 2015, Defendant Idzal wrote to Mrs. Vorchheimer, informing her that no changes to the POA policies could be made until the board meeting on September 21, 2015. She continued:

5

In the interim, I again suggest doing any of the following:

1. Have the doorman put your walker in your car when you leave. I'm sure you have seen them do this on a regular basis for all our residents who need it!

2. If you leave your walker in the lobby, it can by retrieved by:

> 1. Calling either 215-232-1447 (lobby desk) or 215-232-1443 (the doorman) to notify time of your return. The walker will be waiting for you upon your return.

> 2. If you choose not to call, you can sit on the bench in the vestibule while the doorman retrieves it for you.

(A true and correct copy of Defendant Idzal's September 10, 2015 e-mail is attached hereto as Exhibit 5, emphasis from original.) A review of the minutes from that September 21, 2015 meeting reveal that, contrary to Defendant Idzal's representation, Mrs. Vorchheimer's request for a reasonable accommodation was never addressed by the board one way or the other.

30.     Around this same time, Mrs. Vorchheimer commenced administrative enforcement actions against Defendant with the United States Department of Justice (which was later referred to HUD), the Pennsylvania Human Relations Commission, and the Philadelphia Commission on Human Relations.[1]

31.     Over the next twelve (12) months (and continuing to today), and despite the fact that Mrs. Vorchheimer's requested accommodation of having independent access to her walker in the building lobby does not require The Philadelphian to spend any money whatsoever, and does not impact (let alone "fundamentally alter") its operations in any way, Defendants continued their practice of confiscating Mrs. Vorchheimer's walker from the lobby, thereby robbing her of her independence each time she returned to the building.

---

[1] Notwithstanding these administrative proceedings, Plaintiff is permitted to bring this civil action under the FHAA because, as of the time of this filing, no administrative law judge (ALJ) has yet commenced any hearing.

6

32.     Throughout this time, Defendants insisted that it was their prerogative to confiscate Ms. Vorchheimer's walker, and that Ms. Vorchheimer must accede to one of four "alternative" accommodations they preferred, in the interest of aesthetics. Specifically:

a.      Defendants insist that Ms. Vorchheimer can request assistance from the concierge desk each and every time she needs her walker, whereupon they can retrieve it from the inaccessible storage room.

b.      Defendants insist that Ms. Vorchheimer can "phone ahead" to the concierge desk each and every time she arrives at her parking spot, whereupon the concierge personnel can bring her walker to her car.

c.      Defendants insist the Ms. Vorchheimer can relinquish her coveted, designated outdoor parking space and instead start parking her car in the attended valet parking garage.

d.      Defendants insist that Ms. Vorchheimer can request assistance from the doorman of the building each and every time she needs her walker.

33.     Since the actual accommodation she requested is reasonable on its face because it does not impose a financial or administrative burden on The Philadelphian and does not "fundamentally alter" the nature of The Philadelphian's operations in any way, Mrs. Vorchheimer was not legally obligated to accept any of the "alternative" accommodations Defendants happen to prefer in the interest of maintaining the aesthetics of the lobby. Nevertheless, Ms. Vorchheimer did explain to Defendants why their preferred "alternatives" are not workable because they all deprive her of her independence by requiring her to rely upon the assistance and availability of an employee of the building every single time she comes and goes from the building.

7

34.    Indeed, the fallibility of Defendants' preferred "alternative"

accommodations has played itself out in real time. For example, on the evening of October 5, 2015, Mrs. Vorchheimer returned to the Philadelphian to find that her walker had been confiscated from where she had left it. She had to wait in line, standing, behind two other people at the concierge desk before being helped. By that time, due to her disability, Mrs. Vorchheimer was out of breath and in significant physical discomfort. Mrs. Vorchheimer documented this incident in an e-mail to the entire board of the POA. (A true and correct copy of Plaintiff's October 5, 2015 e-mail is attached hereto as Exhibit 6.)

35.    Despite learning that their preferred "alternatives" were not adequately addressing Mrs. Vorchheimer's disabilities, Defendants did not change their policy and practice of confiscating Mrs. Vorchheimer's walker to a location she cannot independently access.

36.    Despite refusing Mrs. Vorchheimer's request, in response to inquiry from governmental authorities, Defendants mischaracterized and misrepresented their own practices and actions. For example, on January 6, 2016, Defendants represented to the Philadelphia Commission on Human Relations that "Residents are not permitted to store personal belongings unattended in the lobby" and that "If permitted, hundreds of residents may begin leaving their walkers around the lobby." On June 27, 2016, however, (and after having switched law firms), Defendants attempted to sanitize their earlier position by falsely representing to the Pennsylvania Human Relations Commission that "Ms. Vorchheimer is free to leave her walker in the lobby if she wishes. Ms. Vorchheimer has never been denied this accommodation."

37.    During the early part of 2016, there were numerous other incidents where, due to Defendants' continuing policy and practice of confiscating her walker, Mrs. Vorchheimer experienced the severe symptoms of her disability. For example, on February 29, March 2, and

8

March 8, 2016, Mrs. Vorchheimer was forced to wait, standing, before being helped by concierge employees who were (understandably) attending to the needs of other residents. This would have been easily avoided had her walker not been confiscated in the first place. To avoid the stress on her body caused by standing (as well as the embarrassment of having her independence stripped of her by Defendants), Mrs. Vorchheimer at times resorted to leaving her walker outside near her parking space, even in inclement weather.

38.     On March 14, 2016, another of Ms. Vorchheimer's physicians, Dr. Harold

I. Palevsky, wrote a letter confirming Ms. Vorchheimer's need to have access to her walker. Dr. Palevsky advised, in part:

> Even just standing, for periods as brief as 5 minutes, result in the
> occurrence of progressive symptoms.
>
> …
>
> Her use of a rolling walker is a medical necessity. I would request
> that you make every effort to allow her access to her rolling walker
> to facilitate maintaining her mobility, and to prevent her from
> having any further falls. Minimizing her periods of unsupported
> standing is also important to controlling her symptoms.

(A true and correct copy of Dr. Palevsky's March 14, 2016 letter is attached hereto as Exhibit 7.)

39.     On May 24, 2016, Defendant Idzal wrote to Ms. Vorchheimer,

acknowledging receipt of Dr. Palevsky's letter, but then simply reiterating their preferred, out-of-sight "alternatives" without discussing the accommodation Mrs. Vorchheimer had *actually* requested. (A true and correct copy of Defendant Idzal's May 24, 2016 letter is attached hereto as Exhibit 8.)

40.     On June 27, 2016, Defendants shamelessly represented to the PHRC that the accommodation requested by Mrs. Vorchheimer was inconsistent with Dr. Palevsky's medical opinion, and that their preferred "alternatives" were actually in Plaintiff's best interests:

9

> It is important to note that Claimant's doctor's note does not require that Claimant keep her walker unattended in the lobby and instead requires Claimant to have "access" to the walker. In fact, Claimant's doctor suggests that she should have her walker at all times – which is totally inconsistent with Claimant's position that [she] should be able to leave the walker in the lobby.

41.    On July 28, 2016, Dr. Palevsky issued a second letter directly refuting

Defendants' insincere assertions:

> It has come to my attention that Mrs. Vorchheimer's condominium association board is hesitant to allow Mrs. Vorchheimer to retrieve her walker in the lobby on her own, claiming that doing so would violate the dictates of my letter of March 14, 2016. This is incorrect. Allow me to clarify and elaborate.
>
> Mrs. Vorchheimer's medical condition requires that she have ready access to her walker or scooter. However, if she is only walking (with the assistance of a cane) the short distance from her car to the lobby, that is acceptable, provided she has access to her walker in the lobby, and is not required to stand waiting assistance for any period of time. I understand that Mrs. Vorchheimer's condominium association has offered to bring her walker to her car if she calls ahead. It would be preferable to simply have her walker available to her in the building lobby so that she can access it on her own. This way she maintains her independence as much as possible, and it removes the possibility that she might be forced to stand while waiting for someone else to retrieve it. When faced with two potential solutions, the one that permits the patient to retain her independence is the better option.

(A true and correct copy of Dr. Palevsky's July 28, 2016 letter is attached hereto as Exhibit 9.)

42.    On August 11, 2016, Defendant Idzal e-mailed Mrs. Vorchheimer stating that Defendants had received Dr. Palevsky's letter and that they would review it. She then, knowing full well that the parties had been engaged in a protracted dispute precisely because Defendants had refused to allow the reasonable accommodation Mrs. Vorchheimer had requested, self-servingly stated, "In the meantime, the Philadelphian remains committed to providing you with a reasonable accommodation that you may need with respect to your walker."

10

43.     Later that same day, Mrs. Vorchheimer's attorney e-mailed Defendants'

counsel, stating:

> Mr. Krandel,
>
> So as to avoid direct communication with your client, I'm
> responding only to you.
>
> I cannot let Ms. Izdal's self-serving statements pass without
> response. The entire reason we're engaged in this proceeding in
> the first place is precisely because the Philadelphian's management
> is NOT providing Ms. Vorchheimer with the reasonable
> accommodation she requested. Rather, the Philadelphian is
> choosing to provide alternative accommodations which it happens
> to like better, but which are, in fact, NOT better for Ms.
> Vorchheimer. As the latest letter from Dr. Palevsky clearly
> provides, the actual accommodation Ms. Vorchheimer requested
> provides for both her medical needs and her independence. And,
> as the law so clearly shows, the Philadelphian is NOT free to pick
> and choose an alternate accommodation so long as the actual
> accommodation Ms. Vorchheimer requested in reasonable, which
> it is. Here is a copy of my legal memorandum on this exact topic.
> I'm also enclosing a copy of the HUD/DOJ Joint Statement, which
> is cited therein, and which speaks to this very issue.

(A true and correct copy of counsel's August 11, 2016 e-mail is attached hereto as Exhibit 10.)

44.     The HUD/DOJ Joint Statement, which was provided to counsel for

Defendants, states, in pertinent part:

> There may be instances where a provider believes that, while the
> accommodation requested by an individual is reasonable, there is
> an alternative accommodation that would be equally effective in
> meeting the individual's disability-related needs. In such a
> circumstance, the provider should discuss with the individual if she
> is willing to accept the alternative accommodation. However,
> providers should be aware that persons with disabilities typically
> have the most accurate knowledge about the functional limitations
> posed by their disability, and *an individual is not obligated to
> accept an alternative accommodation suggested by the provider if
> she believes it will not meet her needs and her preferred
> accommodation is reasonable.*

(Joint Statement, at p. 8, emphasis added, copy attached hereto as Exhibit 11.)

45.     Notwithstanding (i) Dr. Palevsky's clear instruction that the accommodation allowing for Mrs. Vorchheimer's independence is the better option; and (ii) being provided with clear, on-point authority from the DOJ and HUD, Defendants have still refused to budge.

<u>DEFENDANTS RETALIATE AGAINST MRS. VORCHHEIMER.</u>

46.     On or around May 21, 2016, Mrs. Vorchheimer's physical condition worsened to the point where she began using an electric scooter around the building.  Mrs. Vorchheimer had alerted Defendants in writing months earlier of this possibility.

47.     Within the first two weeks, upon information and belief, one or more of the Defendants tampered with Mrs. Vorchheimer's scooter.

48.     Specifically, on or about June 5, 2016, Mrs. Vorchheimer had temporarily left the scooter in a far corner of the building lobby beside a potted plant, where it was well out of the way of foot traffic and barely noticeable.  When she returned to the building later that day, it was apparent someone had pushed it up against the wall and flipped down the seat.

49.     Mrs. Vorchheimer complained to Defendant Bonom, who assured her in writing, "I would not authorize any staff member to touch yours or any other resident[']s property unless it presented a safety hazard."

50.     Following this incident, Mrs. Vorchheimer began placing her scooter in a different location – toward the front of the lobby, close to the doorman vestibule, where it would be in view of the doorman and also under video surveillance.

51.     On or about August 9, 2016, notwithstanding his earlier assurance that residents' property would not be touched unless it presented a safety hazard, Defendant Bonom wrote to Mrs. Vorchheimer:

On Wednesday August 3, 2016 you left your motorized scooter

12

unattended in the lobby.  Please be advised that you are not
permitted to leave this motorized scooter unattended in the lobby.

(A true and correct copy of Defendant Bonom's August 9, 2016 letter is attached hereto as
Exhibit 12.)

52.     On or about August 27, 2016, Mrs. Vorchheimer temporarily left her
scooter in the aforementioned location in the building lobby – where it would not be in anyone's
way or present a safety hazard – while she went out.

53.     When she returned, not only had the scooter been moved, but the "tiller"
had been adjusted in such a way that it was extremely uncomfortable and painful for Mrs.
Vorchheimer to operate it upon her return.  In other words, the scooter had been "squished."
Adjustment of the "tiller" in that fashion is not something that occurs by accident.

54.     Mrs. Vorchheimer was forced to contact a representative of the scooter
company to come out and readjust it for her.  Even when instructed how to do so, Mrs.
Vorchheimer was not strong enough to readjust the "tiller" on her own.

### DEFENDANTS' CONTINUING CONDUCT IS KNOWING AND RECALCITRANT.

55.     To this day, Defendants have never articulated how the *actual*
accommodation requested by Mrs. Vorchheimer in any way imposes an undue financial or
administrative burden on them, or that it would fundamentally alter the nature of the
Philadelphian's operations.

56.     Defendants have been provided on-point legal authority that they cannot
"choose" Mrs. Vorchheimer's accommodation for her so long as her requested accommodation
is reasonable.

57.     Defendants have been provided with a medical opinion clearly stating that
the requested accommodation – the one allowing Mrs. Vorchheimer to maintain her

13

independence – is the better option.

58.     Defendants have been provided with evidence that their proposed "alternatives" are not suitable.

59.     Defendants' conduct under the circumstances has been intentional, wanton, outrageous, and with reckless disregard to the rights of others, namely Mrs. Vorchheimer.

<div align="center">

COUNT I – VIOLATIONS OF THE FAIR HOUSING
AMENDMENTS ACT ("FHAA"), 42 U.S.C. § 3601 *et seq.*

</div>

60.     Plaintiff incorporates by reference her allegations from paragraphs 1 through 59 as if set forth at length herein.

61.     The FHAA declares that it is unlawful to discriminate because of disability by refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

62.     Plaintiff suffers from a disability.

63.     Defendants knew of Plaintiff's disability.

64.     Plaintiff requested a reasonable accommodation, namely the ability to temporarily leave in and then independently retrieve her walker from the lobby of the building as she comes and goes to her car throughout the day.

65.     Defendants knew of Plaintiff's request.

66.     Defendants denied Plaintiff's request.

67.     The requested accommodation is reasonable and necessary to afford Plaintiff an equal opportunity to use and enjoy her home at the Philadelphian.

68.     The requested accommodation will impose zero financial burden on

<div align="center">14</div>

Defendants.

69.     The requested accommodation will impose zero administrative burden on Defendants.

70.     The requested accommodation will not fundamentally alter the nature of the Philadelphian's operations.

71.     Defendants Idzal and Bonom, individually and in their official capacities, have actively participated in the wrongful conduct described herein.

72.     Defendants have violated the FHAA and its regulations. *See, e.g.,* 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § 100.204.

73.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer irreparable harm, for which monetary compensation is inadequate.

74.     The FHAA provides for a private right of action, as well as for actual and punitive damages, temporary, preliminary, and permanent injunctive relief, and reasonable attorneys' fees and costs.  42 U.S.C. § 3613(c).

WHEREFORE, Plaintiff requests judgment in her favor and against Defendants on Count I in an amount to be determined, along with temporary, preliminary, and permanent injunctive relief, punitive damages, attorneys' fees, interest, costs, and such further relief that the Court deems proper.

15

Dated:  September 28, 2016

Respectfully submitted,

_____
Stuart D. Lurie, Esq.
ROSENTHAL LURIE LLC
486 Thomas Jones Way, Suite 210
Exton, PA 19341
(484) 693-0788 – Tel.
(215) 600-1728 – Fax
Stuart@RosenthalLurie.com
*Attorney for Plaintiff, Carol Vorchheimer*

### **Verification**

I hereby verify that the factual averments contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that the statements herein are made subject to 18 Pa. C. S. § 4904 relating to unsworn falsification to authorities.

Dated: September 27, 2016

Carol Vorchheimer

# EXHIBIT 1 TO COMPLAINT

# 8/13/15 E-MAIL

I think to allow everyone and we certainly could not discriminate to start storing items in the lobby I think you would agree could become unsightly.

Sincerely,

Frank Bonom


**Frank J. Bonom**
**General Manager**
**2401 Pennsylvania Avenue**
**Philadelphia, PA 19130**
**Email: fbonom@2401.com**
**Phone 215 232-7400 x 571**
**Fax 215-232-7323**


**From:** carol vorchheimer [mailto:carol.vorch@verizon.net]
**Sent:** Thursday, August 13, 2015 11:54 AM
**To:** Frank Bonom <fbonom@2401.com>
**Subject:** Re: Walker

Mr. Bonom:

I think I am entitled to know which of my neighbors filed a complaint against me or my walker. Unless the Board has passed a resolution I am not aware of, that the disabled and their accoutrements
for their safety must be hidden. If so, please inform me.

I assure you I am not worried about my old walker going missing. It is left there for my safety, and
no one can trip over it where I have been leaving it.   Rules should indeed be followed, but there is something troubling about this incident that reminds me all too well about the Primary Election Day discrimination against the handicapped last May.

And, if there is such a rule, please supply me with a copy and the date that it was passed.

Thank you.

Carol Vorchheimer
12 B-32



On 8/13/2015 9:28 AM, Frank Bonom wrote:

> Dear Ms. Vorchheimer,
>
> Regarding your leaving your walker in the lobby in order to insure that it does
> not go missing, get damaged or have someone trip over it, even though it is

close to the wall we would like to offer that it be given to the front desk person whom will place it in the back room for safe keeping.

Thank you,

Frank Bonom

**Frank J. Bonom**
**General Manager**
**2401 Pennsylvania Avenue**
**Philadelphia, PA 19130**
**Email: fbonom@2401.com**
**Phone 215 232-7400 x 571**
**Fax 215-232-7323**

# EXHIBIT 2 TO COMPLAINT

# 8/13/15 E-MAIL

**To:**carol vorchheimer <carol.vorch@verizon.net>

Dear Ms. Vorchheimer,

No one is disputing your need for a walker the issue is storing it in the lobby. I certainly believe that offering to store your walker or any other resident's walker in a safe out of sight location could not be interpreted as anything but a "reasonable accommodation".

Sincerely,

Frank Bonom

**Frank J. Bonom**
**General Manager**
**2401 Pennsylvania Avenue**
**Philadelphia, PA 19130**
**Email: fbonom@2401.com**
**Phone 215 232-7400 x 571**
**Fax 215-232-7323**

**From:** carol vorchheimer [mailto:carol.vorch@verizon.net]
**Sent:** Thursday, August 13, 2015 12:12 PM
**To:** Frank Bonom <fbonom@2401.com>
**Subject:** Re: Walker

Mr. Bonom,

It has everything to do with a specific complaint that was made by one of my neighbors.   I am entitled to know who that was.

A walker that is needed for medical purposes is not a shopping cart or other item a person leaves hanging around in the lobby.

I regret that some consider a walker unsightly, but until/unless the Board passes a resolution limiting the ability of individuals to leave a walker where it can help them when they return to the building I am not able to buy your 'unsightly' argument.

Carol Vorchheimer
12 B-32

On 8/13/2015 12:04 PM, Frank Bonom wrote:

Dear Ms. Vorchheimer,

It has nothing to do with complaints just as we would not want residents to leave their shopping carts or other items in the lobby.
By putting it behind the desk we are simply trying to offer a reasonable accommodation to you and others in the same situation.

I think to allow everyone and we certainly could not discriminate to start storing items in the lobby I think you  would agree could become unsightly.

Sincerely,

Frank Bonom


**Frank J. Bonom**
**General Manager**
**2401 Pennsylvania Avenue**
**Philadelphia, PA 19130**
**Email: fbonom@2401.com**
**Phone 215 232-7400 x 571**
**Fax 215-232-7323**

**From:** carol vorchheimer [mailto:carol.vorch@verizon.net]
**Sent:** Thursday, August 13, 2015 11:54 AM
**To:** Frank Bonom <fbonom@2401.com>
**Subject:** Re: Walker

Mr. Bonom:

I think I am entitled to know which of my neighbors filed a complaint against me or my walker. Unless the Board has passed a resolution I am not aware of, that the disabled and their accoutrements
for their safety must be hidden.  If so, please inform me.

 I assure you I am not worried about my old walker going missing.  It is left there for my safety, and
no one can trip over it where I have been leaving it.   Rules should indeed be followed,
but there  is something troubling about this incident that reminds me all too well
about the Primary Election Day discrimination against the handicapped last May.

And, if there is such a rule, please supply me with a copy and the date that it was passed.

Thank you.

Carol Vorchheimer
12 B-32


On 8/13/2015 9:28 AM, Frank Bonom wrote:

>Dear Ms. Vorchheimer,

>Regarding your leaving your walker in the lobby in order to insure that it does
>not go missing, get damaged or have someone trip over it, even though it is

# EXHIBIT 3 TO COMPLAINT

# 8/29/15 E-MAIL

for that, not the folks who had legitimate need for support/comfort animals.   Talk to the folks who were forced to leave the building due to their high allergies
whose rights were trampled upon...

This can be solved amicably, June, by you if you wish to.  I don't even mind storing my walker 'out of sight', behind a curtain in a convenient
place in the lobby where I can access it immediately upon my return to the building.


Carol


On 8/29/2015 8:48 AM, JuneIDZAL@aol.com wrote:

**Dear Carol,**

   **Thank you for your correspondence regarding this issue.  As you know from the many changes (extra handrails, automatic doors, braille signs, etc.) we have made in recent years to make The Philadelphian more easily accommodating to our residents with disabilities, it saddens me to receive your letter.**

   **I have seen Frank Bonom, our General Manager, in numerous situations assisting our residents and spending countless hours researching ways to assist our residents. In fact, he was in particular the driving force in assisting you with the help you needed for your guests at Bert's funeral who had disabilities. Thus, your saying he needs sensitivity training in this area, I believe is very much off the mark. His actions regarding your situation in the lobby are entirely within Board policy.**

   **I have been at The Philadelphian since 1978 and no past Board or management has ever condoned residents leaving bikes, scooters, packages, carts, walkers, strollers, wheelchairs, crutches etc. in our exterior lobby area.  I'm sure that when you really reflect on how having 776 units of residents "leaving their personal belongings" you would see that it would cause many more problems than it would solve.  That's why we have the designated storage area behind the Lobby desk!**

   **Your specific issue: you want to leave your walker in a special place designated by you in the lobby area when you return from your errands because you do not wish to wait should another person be ahead of you at the lobby desk due to fatigue issues. Why not just make a phone call to**

the desk (215-232-1447) or the doorman (215-232-1443) to let them
know "I'm going to return at x time, please have my walker available for
me." That solves it all. It's safely stored and waiting for you when you
want it!

   Carol, I hope this helps. We ALL want living at The Philadelphian to be
a positive experience.

        My best,
              June


**Dr. June Idzal**
**Board President**
**The Philadelphian**
**2401 Pennsylvania Avenue #10B34**
**Philadelphia, PA 19130**
**juneidzal@aol.com**
**215-235-0924 (h)**
**917-912-0658 (c)**

In a message dated 8/28/2015 8:18:53 P.M. Eastern Daylight Time, theboard@2401.com writes:


-------------------------------------------
From: carol vorchheimer[SMTP:CAROL.VORCH@VERIZON.NET]
Sent: Friday, August 28, 2015 8:18:34 PM
To: The Board
Cc: Frank Bonom
Subject: HOstile Environment for People with Disabilities
Auto forwarded by a Rule To the Board:

The following was pasted from my email to you of 8/27/2015, 8:55am:

"I have tried using my cane to come and go to my car; I"m done with that.   When I
feel I need the assistance of
my walker waiting for me when I come back from errands, I will leave it in the same
place, to the right of
the concierge desk. If I find it missing, ie, taken behind the concierge's area by
instructions of the General
Manager, I will view that as creating a hostile environment for people with
disabilities--ie, me."

When I came back to the building at 7:50pm this evening, my walker was missing. I
asked the concierge
on duty, Verdell, if he had removed it from where I left it, and he said that he had not.
He went to look
for it, and it appears that another employee removed it upon instructions from Mr.

# EXHIBIT 4 TO COMPLAINT

# DR. DAY LETTER



 **Penn Medicine**                        **PennCare Internal Medicine Associates**

Hospital *of the* University *of* Pennsylvania

David Aizenberg, M.D.
Kathryn McGill-Armento, MSN, CRNP
Karen Bowles, MD
Carol Chou, MD
Susan Day, MD
Theresa Dippolito, MSN, CRNP
Paula Gray, MSN, CRNP
Carmen Guerra, MD
David Horowitz, MD
Michelle Hu, MD
Jeffrey Jaeger, MD
Gillian Lautenbach, MD
Eliot Nierman, MD
Antonette Frasch, MD

9/12/2015

Re:

Carol L Vorchheimer
2401 Pennsylvania Ave Apt 12b32
Philadelphia PA 19130
Fax 215-232-2478

To Whom it may concern:

Carol L Vorchheimer is a patient in my practice who I have been following for many years. She has a complex medical history, which includes multiple conditions which directly affect her mobility and functional status (e.g pulmonary hypertension, lumbar stenosis, lymphedema, obesity). She has asked for a statement related to her current functional status.

I evaluated Ms Vorchheimer in the office on 9/11/2015. At present time, she is dependent on a walker at all times to help provide support in ambulation. Because of her balance issues, attributed to arthritis in her feet and spinal stenosis, a cane does not provide sufficient support to reduce risk of falls. Her gait is broad based and unsteady, because of her midfoot arthritis, and she becomes visibly short of breath with walking even 10 feet from a chair to exam table. This represents a change in her functional status. since the death of her husband last year. The walker allows her to distribute her weight more evenly and move with less effort. In addition, it allows her to exert less strain on her wrist which has carpal tunnel syndrome, reducing pain, and significantly improves her mobility.

Now living alone, Ms Vorchheimer requires optimization of her physical status and use of assistive devices to maintain her independence. She is a strong and capable woman who can take advantage of appropriately provided assistance to maximize her functional status.

Please do not hesitate to contact me for additional information.

Sincerely,

Susan Day, MD
Professor of Clinical Medicine

# EXHIBIT 5 TO COMPLAINT

# 9/10/15 E-MAIL

that
decision will be made between me and my physician.

Carol

On 9/10/2015 3:31 PM, JuneIDZAL@aol.com wrote:

**Dear Carol,**

I understand your wish for an immediate answer to your walker storage issue. However, the process, as you know, is that the Board President cannot make policy changes without discussing them with the entire Board and Management. The Board has not yet met this month. After we meet on the 21st, I will be happy to contact you regarding this issue. That is the process. We are all volunteers here, and it's often difficult to get together as fast as our residents would like us to meet. However, we do our best. I hope this clarifies the process.

In the interim, I again suggest doing any of the following:

1. Have the doorman put your walker in your car when you leave. I'm sure you have seem them do this on a regular basis for all our residents who need it!

2. If you leave your walker in the lobby, it can be retrieved by:

   1. Calling either 215-232-1447 (lobby desk) or 215-232-1443 (the doorman) to notify time of your return. The walker will be waiting for you upon your return.

   2. If you choose not to call, you can sit on the bench in the vestibule while the doorman retrieves it for you.

Carol, these are reasonable solutions. I ask you to choose among them until the Board and Management determine a response to your request for a lobby storage policy change.

**Best regards,**

**June**

Re: I have another suggestion

**Dr. June Idzal**
Board President
The Philadelphian
2401 Pennsylvania Avenue #10B34
Philadelphia, PA 19130

# EXHIBIT 6 TO COMPLAINT

## 10/5/15 E-MAIL

**Subject:** Today's Incident Re Walker Removal
**From:** carol vorchheimer <carol.vorch@verizon.net>
**Date:** 10/5/2015 9:19 PM
**To:** The Board <Theboard@2401.com>

No response to my email re the Board decision re continued removal of my walker.
It would appear that you are satisfied with your  idea of reasonable accommodation--
assigning two employees the task of watching my parking space for my return,
to have either of those two employees lift my walker over the concierge enclosure
and bring it to me.

Today when I returned from visiting my grandchildren, at 5:33pm, I carried my mail
over to the concierge desk, saw that my walker had been removed again, against my
expressed wishes, despite the sign on the walker that I regarded its removal as a
hostile act.

Leaning against the counter,, out of breath, waiting my turn
with two other residents needing help from the concierge I was reduced to the same
humiliation as before.  Felipe has no business lugging that heavy walker over the
barrier,
but he is too proud to say so.  You are causing me misery, subjecting an employee
to
lifting a weight he is not able to do readily, all in the cause of hiding my
'unsightly' walker.

Very well.   You are not addressing the other issue of my future need for an
electric mobility
device that cannot be hidden behind the concierge desk.   I will proceed with the
various
levels of civil rights complaint. I believe you are in violation of Federal,
State and Philadelphia
ADA requirements, similar to your violation of the rights of individuals with a
need for
support animals in the past.    My need for ready access to my walker is no less
legitimate than
their need for a support animal.

Carol Vorchheimer
12 B-32

# EXHIBIT 7 TO COMPLAINT

# DR. PALEVSKY LETTER



# Penn Medicine

**Department of Medicine**

Penn Medicine at University City

**Penn Lung Center**

Harold I. Palevsky, M.D.
*Professor of Medicine*
*Chief, Pulmonary, Allergy & Critical Care Division*
*Director, Pulmonary Vascular Disease Program*

March 14, 2016

To Whom It May Concern:

Re: Carol Vorchheimer  (DOB 2/21/1934)

Dear Sir or Madam:

Mrs. Carol Vorchheimer is an 82 year old woman who has been my patient for the past 16 years. She has multiple significant medical issues. The predominant reason I follow her is for pulmonary vascular disease/pulmonary hypertension. This is a serious medical condition affecting the right side of the heart and limiting functional capacity. The condition has no outward signs unless right heart failure manifests. It is associated with shortness of breath, predominately upon exertion, fatigue, fluid retention and chest discomfort. Stress exacerbates both her symptoms and this medical condition. Even just standing, for periods as brief as 5 minutes, result in the occurrence of progressive symptoms.

Because of her pulmonary vascular disease, in conjunction with her several orthopedic issues, Mrs. Vorchheimer has become increasingly limited in moving around. She is now 100% dependent on her rolling walker – even in her apartment. She has shortness of breath, and leg fatigue limiting her ability to get around. Her concurrent carpal tunnel syndrome limits her ability to support herself with a cane. She can no longer walk from her apartment to her car in the building driveway with just a cane – she must use her walker. She is clearly at a risk of falling (and already has done so).

Her use of a rolling walker is a medical necessity. I would request that you make every effort to allow her access to her rolling walker to facilitate maintaining her mobility, and to prevent her from having any further falls. Minimizing her periods of unsupported standing is also important to controlling her symptoms.

Thank you for your consideration of this medically necessary request. Please do not hesitate to contact me if you have any questions about this.

Yours sincerely,

Harold I. Palevsky, MD, FACP, FCCP, FCCM
Professor of Medicine
University of Pennsylvania School of Medicine
Chief, Pulmonary, Allergy and Critical Care Medicine
Director, Pulmonary Vascular Disease Program
Penn Presbyterian Medical Center
University of Pennsylvania Health System

# EXHIBIT 8 TO COMPLAINT

# 5/24/16 LETTER



## THE PHILADELPHIAN OWNERS' ASSOCIATION
## MANAGEMENT OFFICE
2401 Pennsylvania Avenue
Philadelphia, PA 19130

Phone (215) 232-7400 • Fax (215) 232-7323

May 24, 2016

Ms. Carol Vorchheimer
2401 Pennsylvania Ave., 12B32
Philadelphia, PA 19130

                        via certified mail

Dear Ms. Vorchheimer,

On May 19, 2016, the Association received your May 14 doctor's note requesting the ready use for your rolling walker.

The Association has offered accommodations for your requests in this regard. The Association believes that those prior accommodations sufficiently address this request. The Association offered to keep your walker behind the front desk and available for your immediate use upon request before you exit your car. The Association offered to have a staff person assigned to you to deliver the walker to your car before you exit your car. The Association offered to have a staff person load and unload your walker from your car trunk while you remained in your vehicle. Finally, the Association offered you valet parking in our indoor garage where you could leave your rolling walker in close proximity to the pick-up and drop-off spot for your vehicle.

Please contact us if you wish to accept these accommodations.

Very truly yours,

Dr. June M. Idzal
Board President

cc: The Board
    Frank J. Bonom, GM

# EXHIBIT 9 TO COMPLAINT

# DR. PALEVSKY'S SECOND LETTER



**Penn Medicine**

Penn Medicine at University City

**Department of Medicine**

**Penn Lung Center**

**Harold I. Palevsky, M.D.**
*Professor of Medicine*
*Chief, Pulmonary, Allergy & Critical Care Division*
*Director, Pulmonary Vascular Disease Program*

July 28, 2016

To Whom It May Concern:

Re: Carol Vorchheimer (DOB 2/21/1934)

Dear Sir or Madam:

Mrs. Carol Vorchheimer is an 82 year old woman who has been my patient for the past 16 years.
She has multiple significant medical issues. The predominant reason I follow her is for pulmonary vascular disease/pulmonary hypertension. This is a serious medical condition affecting the right side of the heart and limiting functional capacity. The condition has no outward signs unless right heart failure manifests. It is associated with shortness of breath, predominately upon exertion, fatigue, fluid retention and chest discomfort. Stress exacerbates both her symptoms and this medical condition. Even just standing, for periods as brief as 5 minutes, result in the occurrence of progressive symptoms.

Because of her pulmonary vascular disease, in conjunction with her several orthopedic issues, Mrs. Vorchheimer has become increasingly limited in moving around. She is now 100% dependent on her rolling walker – even in her apartment. She has shortness of breath, and leg fatigue limiting her ability to get around. Her concurrent carpal tunnel syndrome limits her ability to support herself with a cane. She can no longer walk from her apartment to her car in the building driveway with just a cane – she must use her walker. She is clearly at a risk of falling (and already has done so).

It has come to my attention that Mrs. Vorchheimer's condominium association board is hesitant to allow Mrs. Vorchheimer to retrieve her walker in the lobby on her own, claiming that doing so would violate the dictates of my letter of March 14, 2016. This is incorrect. Allow me to clarify and elaborate.

Mrs. Vorchheimer's medical condition requires that she have ready access to her walker or scooter. However, if she is only walking (with the assistance of a cane) the short distance from her car to the lobby, that is acceptabe, provided she has access to her walker in the lobby, and it not required to stand waiting assistance for any period of time. I understand that Mrs. Vorchheimer's condominium association has offered to bring her walker to her at her car if she calls ahead. It would be preferable to simply have her walker readily available to her in the

Re: Mrs. Carol Vorohheimer
Page 2

building lobby so that she can access it on her own.  This way she maintains her independence as much as possible, and it removes the possibility that she might be forced to stand while waiting for someone else to retrieve it.  When faced with two potential solutions, the one that permits the patient to retain her independence is the better option.

Thank you for your consideration of this medically necessary request.  Please do not hesitate to contact me if you have any questions about this.

Yours sincerely,

Harold I. Palevsky, MD, FACP, FCCP, FCCM
*Professor of Medicine*
University of Pennsylvania School of Medicine
Chief, Pulmonary, Allergy and Critical Care Medicine
Director, Pulmonary Vascular Disease Program
Penn Presbyterian Medical Center
University of Pennsylvania Health System

# EXHIBIT 10 TO COMPLAINT

# 8/11/16 E-MAIL

Subject: Re: Gen. Mgr. Frank Bonom
From: "Stuart D. Lurie" <stuart@rosenthallurie.com>
Date: Thu, 11 Aug 2016 09:20:28 -0400
To: rkrandel@fmglaw.com
BCC: carol.vorch@verizon.net

Mr. Krandel,

So as to avoid direct communication with your client, I'm responding only to you.

I cannot let Ms. Idzal's self-serving statements pass without response.  The entire reason we're engaged in this proceeding in the first place is precisely because the Philadelphia's management is NOT providing Ms. Vorchheimer with the reasonable accommodation she requested.  Rather, the Philadelphia is choosing to provide alternative accommodations which it happens to like better, but which are, in fact, NOT better for Ms. Vorchheimer.  As the latest letter from Dr. Palevsky clearly provides, the actual accommodation Ms. Vorchheimer requested provides for both her medical needs and her independence.  And, as the law so clearly shows, the Philadelphian is NOT free to pick and choose an alternate accommodation so long as the actual accommodation Ms. Vorchheimer requested is reasonable, which it is.  Here is a copy of my legal memorandum on this exact topic.  I'm also enclosing a copy of the HUD/DOJ Joint Statement, which is cited therein, and which speaks to this very issue.


--
Stuart D. Lurie, Esq.
ROSENTHAL LURIE LLC
486 Thomas Jones Way, Suite 210
Exton, PA 19341
(484) 693-0788 - Tel.
(215) 600-1728 - Fax
Stuart@RosenthalLurie.com
www.RosenthalLurie.com


**JuneIDZAL@aol.com**                                        August 11, 2016 at 7:41 AM

We received your correspondence.  The Philadelphian will review your doctor's letter.  In the meantime, the Philadelphian remains committed to providing you with a reasonable accommodation that you may need with respect to your walker.  If you have any questions, please contact me.

**Dr. June Idzal**
Board President
The Philadelphian
2401 Pennsylvania Avenue #10B34
Philadelphia, PA 19130
juneidzal@aol.com
215-235-0924 (h)
917-912-0658 (c)

In a message dated 8/9/2016 8:53:59 P.M. Eastern Daylight Time, carol.vorch@verizon.net writes:

─ Attachments: ──────────────────────────────────────

memorandum of relevant authorities.pdf                           116 KB

HUD DOJ joint statement.pdf                                      176 KB

# EXHIBIT 11 TO COMPLAINT

# DOJ/HUD JOINT STATEMENT

…



**U.S. DEPARTMENT OF JUSTICE**
CIVIL RIGHTS DIVISION



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 17, 2004*

<div align="center">

**JOINT STATEMENT OF**
**THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**AND THE DEPARTMENT OF JUSTICE**

***REASONABLE ACCOMMODATIONS UNDER THE***
***FAIR HOUSING ACT***

</div>

## Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]     The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

[2]     The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See* Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted.

[3]     42 U.S.C. § 3604(f)(3)(B).

reasonable accommodations.[4]

## Questions and Answers

**1. What types of discrimination against persons with disabilities does the Act prohibit?**

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4]     Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities. Although Section 504 imposes greater obligations than the Fair Housing Act, (*e.g.*, providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas), the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504. *See* U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and "Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/sect504faq.cfm#anchor272118).

[5]     The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities 42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). *See also* H.R. Rep. 100-711 – 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). *Accord*: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

[6]     42 U.S.C. § 3604(f)(3)(B). HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R. § 100.204.

- 2 -

make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[7] With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

## 2. Who must comply with the Fair Housing Act's reasonable accommodation requirements?

Any person or entity engaging in prohibited conduct – *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling – may be held liable unless they fall within an exception to the Act's coverage. Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services. Courts have also applied the Act to state and local governments, most often in the context of exclusionary zoning or other land-use decisions. *See e.g.*, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002). Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings. The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

## 3. Who qualifies as a person with a disability under the Act?

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

---

[7]     This Statement does not address the principles relating to reasonable modifications. For further information see the HUD regulations at 24 C.F.R. § 100.203. This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.

The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[8] This list of major life activities is not exhaustive. *See e.g.*, Bragdon v. Abbott, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

### 4. Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?

No, juvenile offenders and sex offenders, by virtue of that status, are <u>not</u> persons with disabilities protected by the Act. Similarly, while the Act does protect persons who are recovering from substance abuse, it does <u>not</u> protect persons who are currently engaging in the current illegal use of controlled substances.[9] Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

### 5. How can a housing provider determine if an individual poses a direct threat?

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts). The assessment must consider: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat. Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm). In such a situation, the provider may request that the individual document

---

[8]     The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity. See Toyota Motor Mfg. Kentucky, Inc. v. Williams, 122 S. Ct. 681, 692, 693 (2002). If it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job. *See* Sutton v. United Airlines, Inc., 527 U.S. 470, 492 (1999).

[9]     *See*, *e.g.*, United States v. Southern Management Corp., 955 F.2d 914, 919 (4th Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance").

how the circumstances have changed so that he no longer poses a direct threat. A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy. The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 1**: A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence. On her application to rent an apartment, a woman notes that she currently resides in Cambridge House. The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism. Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant. The rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct. The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit. However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references. If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

**Example 2**: James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat. The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents. Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat. Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process. James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability. The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and

- 5 -

periodic medication monitoring so that he will no longer pose a direct threat
during his tenancy. After consulting with James X, the attorney responds that
James X is unwilling to receive counseling or submit to any type of periodic
monitoring to ensure that he takes his prescribed medication. The rental manager
may go forward with the eviction proceeding, since James X continues to pose a
direct threat to the health or safety of other residents.

### 6. What is a "reasonable accommodation" for purposes of the Act?

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy,
practice, or service that may be necessary for a person with a disability to have an equal
opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules,
policies, practices, and services may have a different effect on persons with disabilities than on
other persons, treating persons with disabilities exactly the same as others will sometimes deny
them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to
make reasonable accommodations to rules, policies, practices, or services when such
accommodations may be necessary to afford persons with disabilities an equal opportunity to use
and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable
relationship, or nexus, between the requested accommodation and the individual's disability.

**Example 1:** A housing provider has a policy of providing unassigned parking
spaces to residents. A resident with a mobility impairment, who is substantially
limited in her ability to walk, requests an assigned accessible parking space close
to the entrance to her unit as a reasonable accommodation. There are available
parking spaces near the entrance to her unit that are accessible, but those spaces
are available to all residents on a first come, first served basis. The provider must
make an exception to its policy of not providing assigned parking spaces to
accommodate this resident.

**Example 2:** A housing provider has a policy of requiring tenants to come to the
rental office in person to pay their rent. A tenant has a mental disability that
makes her afraid to leave her unit. Because of her disability, she requests that she
be permitted to have a friend mail her rent payment to the rental office as a
reasonable accommodation. The provider must make an exception to its payment
policy to accommodate this tenant.

**Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf
requests that the provider allow him to keep a dog in his unit as a reasonable
accommodation. The tenant explains that the dog is an assistance animal that will
alert him to several sounds, including knocks at the door, sounding of the smoke
detector, the telephone ringing, and cars coming into the driveway. The housing

- 6 -

provider must make an exception to its "no pets" policy to accommodate this
tenant.

**7. Are there any instances when a provider can deny a request for a reasonable
accommodation without violating the Act?**

Yes. A housing provider can deny a request for a reasonable accommodation if the
request was not made by or on behalf of a person with a disability or if there is no disability-
related need for the accommodation. In addition, a request for a reasonable accommodation may
be denied if providing the accommodation is not reasonable – *i.e.*, if it would impose an undue
financial and administrative burden on the housing provider or it would fundamentally alter the
nature of the provider's operations. The determination of undue financial and administrative
burden must be made on a case-by-case basis involving various factors, such as the cost of the
requested accommodation, the financial resources of the provider, the benefits that the
accommodation would provide to the requester, and the availability of alternative
accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable,
the provider should discuss with the requester whether there is an alternative accommodation that
would effectively address the requester's disability-related needs without a fundamental alteration
to the provider's operations and without imposing an undue financial and administrative burden.
If an alternative accommodation would effectively meet the requester's disability-related needs
and is reasonable, the provider must grant it.  An interactive process in which the housing
provider and the requester discuss the requester's disability-related need for the requested
accommodation and possible alternative accommodations is helpful to all concerned because it
often results in an effective accommodation for the requester that does not pose an undue
financial and administrative burden for the provider.

**Example:** As a result of a disability, a tenant is physically unable to open the
dumpster placed in the parking lot by his housing provider for trash collection.
The tenant requests that the housing provider send a maintenance staff person to
his apartment on a daily basis to collect his trash and take it to the dumpster.
Because the housing development is a small operation with limited financial
resources and the maintenance staff are on site only twice per week, it may be an
undue financial and administrative burden for the housing provider to grant the
requested daily trash pick-up service. Accordingly, the requested accommodation
may not be reasonable. If the housing provider denies the requested
accommodation as unreasonable, the housing provider should discuss with the
tenant whether reasonable accommodations could be provided to meet the tenant's
disability-related needs – for instance, placing an open trash collection can in a
location that is readily accessible to the tenant so the tenant can dispose of his
own trash and the provider's maintenance staff can then transfer the trash to the
dumpster when they are on site.  Such an accommodation would not involve a

- 7 -

fundamental alteration of the provider's operations and would involve little
financial and administrative burden for the provider while accommodating the
tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation
requested by an individual is reasonable, there is an alternative accommodation that would be
equally effective in meeting the individual's disability-related needs. In such a circumstance, the
provider should discuss with the individual if she is willing to accept the alternative
accommodation. However, providers should be aware that persons with disabilities typically
have the most accurate knowledge about the functional limitations posed by their disability, and
an individual is not obligated to accept an alternative accommodation suggested by the provider
if she believes it will not meet her needs and her preferred accommodation is reasonable.

### 8. What is a "fundamental alteration"?

A "fundamental alteration" is a modification that alters the essential nature of a provider's
operations.

**Example:** A tenant has a severe mobility impairment that substantially limits his
ability to walk. He asks his housing provider to transport him to the grocery store
and assist him with his grocery shopping as a reasonable accommodation to his
disability. The provider does not provide any transportation or shopping services
for its tenants, so granting this request would require a fundamental alteration in
the nature of the provider's operations. The request can be denied, but the
provider should discuss with the requester whether there is any alternative
accommodation that would effectively meet the requester's disability-related needs
without fundamentally altering the nature of its operations, such as reducing the
tenant's need to walk long distances by altering its parking policy to allow a
volunteer from a local community service organization to park her car close to the
tenant's unit so she can transport the tenant to the grocery store and assist him
with his shopping.

### 9. What happens if providing a requested accommodation involves some costs on the part of the housing provider?

Courts have ruled that the Act may require a housing provider to grant a reasonable
accommodation that involves costs, so long as the reasonable accommodation does not pose an
undue financial and administrative burden and the requested accommodation does not constitute
a fundamental alteration of the provider's operations. The financial resources of the provider, the
cost of the reasonable accommodation, the benefits to the requester of the requested
accommodation, and the availability of other, less expensive alternative accommodations that
would effectively meet the applicant or resident's disability-related needs must be considered in
determining whether a requested accommodation poses an undue financial and administrative

- 8 -

burden.

### 10.  What happens if no agreement can be reached through the interactive process?

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation.  If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law and decide if the housing provider violated that law.  For more information about the complaint process, see question 19 below.

### 11.  May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?

No.  Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

> **Example 1**:  A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes.  He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises.  It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes.  Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter.  However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property.  If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

> **Example 2:**  Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation.  The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal.  However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for

- 9 -

the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

### 12. When and how should an individual request an accommodation?

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf. An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation." However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made. To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made. However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

**Example:** A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend. The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

### 13. Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?

No. The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests. However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted. If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling. See Questions 16 - 18, which discuss the disability-related information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

### 14. Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?

No. A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made. A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

### 15. What if a housing provider fails to act promptly on a reasonable accommodation request?

A provider has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

### 16. What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities. Housing providers may, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:

- 11 -

- An inquiry into an applicant's ability to meet the requirements of tenancy;
- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;
- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and
- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:** A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis. The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units. However, the provider may not ask applicants if they have other types of physical or mental impairments. If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:** A housing provider operates housing that is legally limited to persons with chronic mental illness. The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing. However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments. If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation. See Questions 17 and 18 below.

**17. What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?**

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability. If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information

about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

> **Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

> **Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

> **Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

### 18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability (*see* Answer 16, above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[10] or a credible statement by the individual). A doctor or other

---

[10]     Persons who meet the definition of disability for purposes of receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.*, Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999)

medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

**19. If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial. If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

• By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;

• By completing the "on-line" complaint form available on the HUD internet site: http://www.hud.gov; or

• By mailing a completed complaint form or letter to:

> Office of Fair Housing and Equal Opportunity
> Department of Housing & Urban Development
> 451 Seventh Street, S.W., Room 5204
> Washington, DC 20410-2000

---

(noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

- 14 -

Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated. The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance. The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act. To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

> U.S. Department of Justice
> Civil Rights Division
> Housing and Civil Enforcement Section – G St.
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530

For more information on the types of housing discrimination cases handled by the Civil Rights Division, please refer to the Housing and Civil Enforcement Section's website at http://www.usdoj.gov/crt/housing/hcehome.html.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit. However, litigation can be an expensive, time-consuming, and uncertain process for all parties. HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation. HUD attempts to conciliate all Fair Housing Act complaints. In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.



# THE PHILADELPHIAN OWNERS' ASSOCIATION
## MANAGEMENT OFFICE
2401 Pennsylvania Avenue
Philadelphia, PA 19130

Phone (215) 232-7400 • Fax (215) 232-7323

August 9, 2016

Ms. Carol Vorchheimer
2401 Pennsylvania Avenue, 12B32
Philadelphia, PA 19130

Dear Ms. Vorchheimer,

On Wednesday August 3, 2016 you left your motorized scooter unattended in the lobby.  Please be advised that you are not permitted to leave this motorized scooter unattended in the lobby.

Very truly yours,

Frank J. Bonom
General Manager

cc: The Board